IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO.  1:09cr263 (CMH) |
| | ) | |
| v. | ) | Count 1:  Conspiracy to act as unregistered agent of a |
| | ) | foreign government and to commit honest services |
| JAMES WILBUR FONDREN, JR., | ) | wire fraud, 18 U.S.C. § 371 |
| | ) | |
| Defendant. | ) | Count 2:  Aiding and abetting an agent of a foreign |
| | ) | government, 18 U.S.C. §§ 2 and 951 |
| | ) | |
| | ) | Counts 3-5:  Unlawful communication of classified |
| | ) | information by a government employee, |
| | ) | 50 U.S.C. § 783(a) |
| | ) | |
| | ) | Counts 6-8:  False statements, 18 U.S.C. § 1001 |

SUPERSEDING INDICTMENT

August 2009 Term - At Alexandria

THE GRAND JURY CHARGES THAT:

GENERAL ALLEGATIONS

At all times material to this Indictment:

1.      In or about May 1996, defendant JAMES WILBUR FONDREN, JR. retired from

active duty as a Lieutenant Colonel in the United States Air Force.  In this position, FONDREN

had held a Top Secret security clearance.

2.      On or about March 27, 1996, FONDREN signed a document entitled "Security

Termination Statement," in which he acknowledged his obligation to protect classified

information.  By signing this document, FONDREN also acknowledged that "[c]ommunicating

classified information to an agent or representative of a foreign government" would be a

violation of certain enumerated criminal statutes, including "Section 783 of Title 50, U.S. Code,"

and that his "signature on this form is my acknowledgment that I have been informed of the criminal statutes applicable to espionage and the punishments provided for violation of these statutes."

3.      In or about 1997, FONDREN began earning additional income by providing consulting services to an acquaintance by the name of Tai Shen Kuo, a resident of New Orleans, Louisiana. Kuo is a naturalized United States citizen, who was born in Taipei, Taiwan. Kuo traveled regularly to the People's Republic of China (PRC), and he maintained an office in Beijing. Kuo had a variety of business interests in the United States, the PRC, and Taiwan. Kuo did not hold a United States security clearance at any time and, therefore, was not entitled to view or possess United States classified information.

4.      In or about February 1998, FONDREN formed a consulting firm which he operated from his home, within the Eastern District of Virginia, under the name Strategy, Inc. Kuo was FONDREN's only client in this consulting business.

5.      Kuo maintained relationships with various officials from the Taiwan Ministry of Defense, and FONDREN was aware of Kuo's relationships with these officials. FONDREN was also aware that Kuo had maintained a close relationship with an individual in the PRC by the name of Lin Hong, to whom Kuo had introduced FONDREN during a trip the two took to the PRC in March 1999. Lin Hong was an official of the PRC government, and FONDREN knew that Lin had close contacts with the PRC government in Beijing.

6.      From in or about August 2001 through February 11, 2008, FONDREN was employed by the United States government at the Department of Defense (DoD) as the Deputy Director of the Washington Liaison Office of the United States Pacific Command (PACOM), a

2

Unified Combatant Command of the Armed Forces of the United States covering the Asia-Pacific region. FONDREN's office was located in the Pentagon, in Arlington, Virginia, within the Eastern District of Virginia. In this position, FONDREN held a Top Secret security clearance with access to Sensitive Compartmented Information (SCI). In accepting the security obligations that come with access to Sensitive Compartmented Information, FONDREN signed an SCI Nondisclosure Statement, acknowledging his obligation to protect classified information, as well as his understanding that "by being granted access to SCI, special confidence and trust shall be placed in me by the United States Government."

7.     At various times during which FONDREN was entrusted with classified information, FONDREN was made aware of his obligation and duty to safeguard such information and not to disclose it to unauthorized persons.

8.     Pursuant to Executive Order 12958, as amended by Executive Order 13292, national security information is classified as "TOP SECRET," "SECRET" or "CONFIDENTIAL." The designation "TOP SECRET" applies to information, the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to national security. The designation "SECRET" applies to information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to national security. The designation "CONFIDENTIAL" applies to information, the unauthorized disclosure of which reasonably could be expected to cause damage to national security. Classified information, of any designation, may only be shared with persons determined by an appropriate United States government official to be eligible for access to classified information, who have signed an approved non-disclosure agreement, and who possess a need to know the classified

3

information. If a person is not eligible to receive classified information, classified information may not be disclosed to that person.

COUNT ONE

18 U.S.C. § 371

*Conspiracy to Act as An Unregistered Agent of a Foreign Government
and to Commit Honest Services Wire Fraud*

THE GRAND JURY FURTHER CHARGES THAT:

A.     The Grand Jury realleges and incorporates by reference the General Allegations of this Indictment.

B.     From in or about 1997 through in or about February 2008, in the Eastern District of Virginia and elsewhere, defendant JAMES WILBUR FONDREN, JR. did unlawfully and knowingly conspire with Tai Shen Kuo and Lin Hong, and with persons known and unknown to the Grand Jury, to commit the following offenses against the United States:

(i)  To knowingly act in the United States as an agent of a foreign government (that is, an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official) without prior notification to the Attorney General as required by rules and regulations promulgated by the Attorney General establishing requirements for notification, that is, Title 28, Code of Federal Regulations, Part 73, a violation of Title 18, United States Code, Section 951; and

(ii)  To knowingly devise and intend to devise a scheme and artifice to defraud and deprive the Department of Defense and the citizens of the United States of their right to the honest services of the defendant, performed free from deceit, favoritism, self-enrichment, self-dealing, concealment and conflict of interest, and for the purpose of executing and attempting to execute that scheme and artifice, to transmit and cause to be transmitted in interstate and foreign

5

commerce, by means of wire communications, certain writings, signs and signals, a violation of Title 18, United States Code, Sections 1343 and 1346.

Manner and Means of the Conspiracy

1.      It was part of the conspiracy that from in or about 1997 to in or about August 2001, FONDREN would provide sensitive United States government information and documents to Tai Shen Kuo and Lin Hong.  FONDREN incorporated some of the information into "opinion papers" that he would write and provide to Kuo for a fee, which Kuo would pay by check.  The topics of those opinion papers were selected by Lin Hong, who would task Kuo with getting the information from FONDREN.

2.      It was further part of the conspiracy that FONDREN and Kuo would communicate with each other by email, telephone, and in person.  Following a March 1999 trip to China, in which Kuo introduced FONDREN to Lin Hong, FONDREN and Lin Hong exchanged numerous email messages pertaining to information and documents Lin Hong was seeking.

3.      It was further part of the conspiracy that Lin Hong would regularly direct Kuo to obtain DoD documents and other DoD information from FONDREN, typically referring to FONDREN by the codename "Fang" or simply "F."  Lin Hong would give Kuo specific instructions, via telephone, email, and in person, as to what information and documents to collect and how to deliver them to the PRC.  Kuo would communicate covertly with Lin Hong, and deliver to him information and documents obtained from FONDREN.

4.      It was further part of the conspiracy that, after FONDREN returned to the Pentagon in August 2001, Kuo would, at the direction of Lin Hong, attempt to mislead

6

FONDREN into believing that Kuo was collecting DoD information for Taiwan government officials, in order to get more sensitive information from FONDREN.

5.      It was further part of the conspiracy that FONDREN would provide to Kuo certain DoD documents and DoD information, some of which FONDREN obtained from classified computer systems and other sources available to him only by virtue of his employment by DoD and the security clearances entrusted to him.

6.      It was further part of the conspiracy that FONDREN would incorporate classified U.S. government information into some of his opinion papers, which FONDREN continued to sell Kuo through his consulting firm, Strategy, Inc.  Kuo would pay FONDREN hundreds of dollars, in varying amounts, for each of the opinion papers.  FONDREN would also provide Kuo with various DoD documents not intended for release to the general public, some of which were marked "For Official Use Only," for which Kuo also would pay FONDREN.

7.      It was further part of the conspiracy that, although Kuo had previously paid FONDREN by check, once FONDREN returned to DoD, he would have Kuo pay him in cash for opinion papers and other DoD documents.  FONDREN would fail to report this cash income on his federal income tax returns in order to disguise his business and financial arrangements with Kuo.

8.      It was further part of the conspiracy that Kuo would pay FONDREN in greater amounts depending upon the sensitivity of the information and documents FONDREN provided.

9.      It was further part of the conspiracy that, in exchange for payments from Kuo, FONDREN would misuse his official government position and, solely by virtue of that position, improperly obtain and transmit sensitive government information and documents to Kuo,

7

depriving DoD and the citizens of the United States of their right to FONDREN's honest services as a government official.

Overt Acts

In furtherance of the conspiracy, and to accomplish its unlawful objects, the defendant, JAMES WILBUR FONDREN, JR., and his co-conspirators performed the following overt acts in the Eastern District of Virginia and elsewhere:

1.  On or about November 7, 1997, FONDREN sent an email to a DoD official at the Pentagon stating, in reference to Kuo:

> My business clients [sic] returned from two months in China this week and provided feedback on your guidance in September.
>
> I believe it important to note that your points were taken seriously enough to be delivered to high level PLA leadership.

[NOTE: The PLA (People's Liberation Army) is the military arm of the PRC.]  Attached to FONDREN's email was a memorandum he had prepared summarizing Kuo's visit and meetings with PRC Official Lin Hong.  FONDREN noted that "Director Lin" had invited him to "Guangdong at PRC expense," and further stated, "If I can accept this gratuity without becoming a PRC agent, then I will consider visiting China next year."

2.  On or about May 18, 1998, FONDREN sent a personal acquaintance an email stating, in reference to Kuo:

> My only client pissed me off the other day and I may tell him to take a hike.  He is using my information papers to get closer to the Chinese government which likes my ideas.  I am uncomfortable with his growing demands for confidential information so he can look good so I said 'no' which has created an awkward situation. Will wait until he returns from China to address the issue.

8

3.    On or about June 13, 1998, FONDREN sent Kuo an email advising that he would send Kuo an update based on talks FONDREN had had at the Pentagon regarding the East Asia Strategy Report and PACOM.  FONDREN also stated that he did not accept Kuo's proposition that FONDREN not be paid for his efforts on behalf of Kuo and asserted, "That has been our understanding from the beginning, and anything else betrays that understanding."

4.    On or about June 18, 1998, Kuo paid FONDREN $1,500 with a check drawn on Kuo's GTL International bank account.

5.    On or about July 17, 1998, FONDREN sent Kuo an email attaching a copy of the draft U.S. National Security Strategy.

6.    On or about July 31, 1998, Kuo paid FONDREN $1,000 with a check drawn on Kuo's GTL International bank account.

7.    On or about October 8, 1998, FONDREN sent an email message to an Army Colonel requesting a draft copy of an Army Field Manual, falsely explaining that it was for FONDREN's own use:

> I vacillated over asking for a copy of the draft FM 100-5 because I don't want to put you in an awkward position by giving an advance copy of the new document to a total unknown such as myself.  But in my desire to learn how the Army addresses future operational issues has gotten the better of me. I will not be using the draft 100-5 for any purpose other than as a part of my own continuing education, nor will I publish any part thereof or refer to it in any of my publications.

8.    After the October 8, 1998, email, FONDREN drafted an undated memorandum for Kuo with a subject line, "Washington Update for November 1998."  Under the heading "Army Field Manual 100-5, Operations," the memorandum stated that FONDREN had discussed the Army Field Manual with a former Army colleague and, although the manual would not be

9

published for six months to a year, the colleague planned to mail FONDREN an advance copy the following day. The memorandum then stated that FONDREN would review the manual and "forward at the earliest opportunity."

9.     On or about October 9, 1998, Kuo paid FONDREN $2,000 with a check drawn on Kuo's GTL International bank account.

10.     In or about March 1999, FONDREN traveled with Kuo to the PRC and met with Lin Hong and his boss, an official of the PRC.

11.     On or about April 9, 1999, Lin Hong sent FONDREN an email message stating:

> Got your two emails. Thanks a lot. Everything OK with you? The weather outside is not so kindly, please take care while working.

12.     On or about May 5, 1999, Lin Hong sent FONDREN an email message stating:

> Please remember what we said here concerning working. Do enerything [sic] naturally, no matter working or exercising. Any chance to attend conferences recently? Tai will be back next week. He'll see you then. By the way, is the other Feb.report available (dod on tmd)?

13.     On or about May 6, 1999, FONDREN sent Lin Hong an email message stating:

> I will ask about the TMD [Theater Missile Defense] report when I go to the Pentagon this afternoon and get back to you. I believe that the TMD report is slow to be released because the new unclassified version must go through a great deal of coordination before it can be released and there are opponents in government who don't want to release it so they become road blocks in the process.

14.     On or about May 6, 1999, FONDREN sent Lin Hong an email message stating:

> Just called [a colonel], China Desk Officer in DoD, and asked him about the TMD report. The report has been sent to the Congress for review and will be released to the public on 21 May. It is finalized but unclassified versions have not yet been released. I'm going to try to get a copy today if my friends have access to it.

10

15.     On or about May 20, 1999, Kuo paid FONDREN $1,150 with a check drawn on

Kuo's GTL International bank account.

16.     On or about July 12, 1999, Lin Hong sent FONDREN an email message stating:

> By the way, I suggest you use abbreviations rather than the long
> term concerning dod agencies. I can understand your meaning.
> Seeing [abbreviated last name of colonel]? (instead of his full
> name, for example).

17.     On or about December 14, 1999, FONDREN sent Kuo an email message saying

that he had had a "great conversation with the people who are publishing Army Manual 100-5."

> The document has been under revision for about two years, and the
> people writing the latest draft document say it won't be ready for
> publication before September 2000. . . . So, please pass to Lin that
> I'm continuing to follow the development of these publications and
> the draft National Security Strategy document, but there is nothing
> available at this time.

18.     On or about December 15, 1999, FONDREN wrote a letter to a friend stating,

"My clients use my papers to further their discussions (and influence) in China, Korea, and

Taiwan at various government levels from city and provinces to the national governments . . . .

The PRC government, following discussions with my client, has already adopted some of my

suggestions."

19.     On or about December 15, 1999, Kuo paid FONDREN $1,000 with a check

drawn on Kuo's GTL International bank account.

20.     On or about December 16, 1999, Kuo sent FONDREN an email reply saying,

"Very good job that what you need do more often."  On the same day, FONDREN responded,

> I understand the point you make, but I've been calling and
> checking up on this document every six months for the almost two
> years, and I don't want to call too often and have them question
> why I'm asking a lot of questions.

11

21.     On or about January 20, 2000, Kuo paid FONDREN $1,000 with a check drawn on Kuo's GTL International bank account.

22.     On or about June 8, 2000, FONDREN sent Kuo a paper he had written following a meeting with a U.S. Air Force Colonel in the Office of the Assistant Secretary of Defense for Command, Control, Communications, Computers, and Intelligence (C4I). The paper was entitled, "ROC [Republic of China (Taiwan)] C4I Study," and was sent to Kuo attached to an email message stating:

> Attached is the study paper you requested. Please guard carefully, let no one know that it exists, and destroy it as soon as you can.

23.     On or about November 8, 2004, FONDREN sent an email from his classified DoD computer, located in the Pentagon, to a U.S. Army Lieutenant Colonel. The email requested information related to a past U.S. visit by a senior PRC military official.

24.      On or about November 22, 2004, FONDREN received an email response from the Lieutenant Colonel. Attached to the email were two classified intelligence information reports (IIRs) about the senior PRC military official's U.S. visit. The IIRs, both classified CONFIDENTIAL, were written by the Defense Intelligence Agency (DIA).

25.     On or about November 24, 2004, FONDREN sent Kuo an email message attaching an opinion paper the defendant had written entitled, "Visit of [senior PRC military official]," which contained excerpts, classified CONFIDENTIAL, from one of the DIA IIRs.

26.     On or about May 27, 2005, FONDREN sent an email to himself on his classified DoD computer, located in the Pentagon. Included in the text of the email was a United States Department of State (DOS) cable classified SECRET.

12

27.     On or about June 5, 2005, FONDREN sent Kuo an email message attaching an opinion paper the defendant had written entitled, "DoD-PLA Defense Consultative Talks," which contained numerous excerpts of individually marked classified paragraphs from the DOS cable classified SECRET.

28.     On or about January 6, 2006, FONDREN received a work email, marked CONFIDENTIAL, with an attached draft of the Quadrennial Defense Review (QDR). The draft was dated January 6, 2006, and the email instructed recipients that the report was "close-hold, limited distribution." (The QDR is a congressionally mandated report that describes United States military doctrine.)

29.     On or about January 12, 2006, FONDREN sent Kuo an email stating, "Document going to printer on 18 JAN and to Congress on 6 FEB; what is your mailing address?"

30.     On or about January 14, 2006, FONDREN sent a Priority Mail package to Houma, Louisiana. A copy of the draft QDR was later found at Kuo's residence in Houma.

31.     On or about January 23, 2006, Kuo called FONDREN and said he had not received the package. FONDREN responded, "[Expletive]. [Expletive]. . . . I got the damn receipt from the post office."

32.     On or about January 27, 2006, Kuo left FONDREN a voice mail saying, "Jim, just let you know I got it yesterday. I came home today and saw that in my mailbox . . . . Thank you very much. I'm sending you a check tomorrow."

33.     On or about March 11, 2006, in a telephone conversation between Kuo and FONDREN, in which the two discussed Kuo's interest in obtaining two DoD publications, Kuo told the defendant that he had $1,000 for him. FONDREN told Kuo not to mail the money and

also told Kuo that he would try to get him the documents. Kuo stated that he was coming to town the first part of April and would bring FONDREN the cash.

34.    On or about September 22, 2006, Lin Hong sent Kuo an email stating, "some shipvisit is underway in HI, any views from f'boss??" Two days later, Lin Hong followed up with another email to Kuo advising, "planavyships took part in a jointexercise in hi, just finished. Another similar one will happen this Nov in shanghai. So f can find things on future bilateral-m-exchanges!!"

35.    On or about October 30, 2006, Lin Hong sent Kuo an email requesting two DoD publications: Joint Publication 3-13 on Information Operations, and Army Field Manual 3-0.

36.    On or about November 1, 2006, Kuo emailed FONDREN requesting that he get Kuo a copy of "the JP3-13."

37.    On or about November 2, 2006, Kuo telephoned FONDREN and requested a copy of Joint Publication 3-07.2, an anti-terrorism book. The two discussed the fact that the publication was marked "For Official Use Only," and FONDREN agreed to get it for Kuo. Kuo expressed his appreciation and told FONDREN that he would give him "something."

38.    On or about November 3, 2006, Kuo telephoned FONDREN and asked him to send him the two Joint Publications by express mail.

39.    On or about November 3, 2006, following his conversation with Kuo, FONDREN called the DoD Joint Staff Service Desk and asked where he could find Joint Publications on SIPRNET (a computer network system for classified information).

40.    On or about November 6, 2006, FONDREN sent Kuo an email stating "I found the books that you are looking for, and will try to send today to Houma [Louisiana]." In a later

14

telephone conversation, FONDREN told Kuo that he had mailed him both books at a cost of $26.00. Kuo told FONDREN not to worry, that he owed FONDREN a lot more than that.

41.     On or about November 7, 2006, Lin Hong sent an email message to Kuo inquiring about the anti-terrorism Joint Publication (JP 3-07.2). The following day, the FBI intercepted a package being sent from FONDREN to Kuo, which contained the two Joint Publications.

42.     On or about January 7, 2007, FONDREN spoke with Kuo by telephone. Kuo told FONDREN that he had been contacted by an investigator conducting FONDREN's five year security re-investigation (United States government personnel with security clearances are periodically re-investigated). FONDREN told Kuo, "They, they want to be sure that, you know, I am not passing secrets, and I am not passing information." FONDREN went on to counsel Kuo, "Listen, I told them we don't even have a cont --, contractual relationship, but -- You know there is no financial relationship between us." In this way, FONDREN and Kuo tacitly agreed to mislead the investigator concerning the true nature of their relationship.

43.     On or about January 27, 2007, Kuo sent an email message to Lin Hong stating, "F told me not to call for a while becasue [sic] the investigation. but will call him today."

44.     On or about February 24, 2007, Kuo contacted FONDREN by telephone and asked him to obtain an early draft of a DoD report to Congress on the capability of the PLA, entitled, "The Military Power of the People's Republic of China." FONDREN informed Kuo that contractors prepared that report for the Office of the Secretary of Defense and that they would not release an early draft to FONDREN.

45.     On or about February 26, 2007, Lin Hong and Kuo spoke by telephone. Lin Hong told Kuo that his "boss" was not pleased with two written items and that the "boss" felt that the

15

papers were ordinary, lacked content, and did not reflect what "Fang" knew in the "company." Lin Hong then suggested that Kuo have a good discussion with "Fang." Lin Hong also stated that, in the future, "Fang" should simply locate and send items rather than write papers because writing took too long and required too much thinking.

46.   On or about February 28, 2007, Kuo sent an email to FONDREN stating, "I heard that DOD annual PLA Military capabilities 2007's draft is out there. Can you try your best to get one for me before they publish?"

47.   On or about March 2, 2007, FONDREN received on his classified email system an email message from a DoD colleague. It included the text, "Jim: As requested," and attached a draft copy of the DoD report.

48.   On or about March 2, 2007, FONDREN sent the DoD colleague a reply email message saying, "Thank you . . . . I will protect the report . . . ."

49.   On or about March 2, 2007, Kuo called FONDREN at home and again asked if he had been able to locate the PLA military capability draft. FONDREN replied, " I can't talk about uh -- that stuff over the phone."

50.   On or about March 3 and 4, 2007, Kuo stayed as a guest in FONDREN's residence. On March 3, 2007, the following exchange occurred:

FONDREN:   This is the report I didn't want you to talk about over the telephone.

Kuo:   Thank you, thank you very much.

FONDREN:   Let people find out I did that, it will cost me my job.

Kuo:   Oh, I am sorry. I am sorry. I wouldn't say anything.

\*   \*   \*

16

FONDREN:    Yeah, I had trouble getting that document.  Those other documents that you wanted?  [Expletive].

Kuo:    Couldn't find it or you found it?

\* \* \*

FONDREN:    I mean people say, "Why you want -- why you want it?"  Getting this document right here? [Expletive]!

Kuo:    Okay

FONDREN:    It would cost my job if people learned that.

\* \* \*

Kuo:    When they going to publish it?

\* \* \*

FONDREN:    Don't know.  We know that they are going back and forth and arguing with State Department over every little period, every little detail.  So it could be, it could be a couple weeks, it could be a month, you know?  But um -- They are -- This is a very, quote, sensitive document.

Kuo:    Okay, but they are going to publish anyway, huh?  Right?

FONDREN:    They got to.  They got to send it to Congress.  They will only send -- They will only publish part of it.

Kuo:    Oh, okay.

FONDREN:    An unclassified.  What I gave you is --

Kuo:    Is whole thing?

FONDREN:    That is -- The whole thing has classified appendixes.

Kuo:    Okay.  You got those in there too?

FONDREN:    Oh no, not the classified stuff.

17

Kuo:           You don't, okay, okay.

FONDREN:       That was secret and no way I can carry that, that out, but um --
               Anyhow.  So this is, this has a lot of detail in it anyway . . . .

                              *   *   *

FONDREN:       Well.  It's, it gets, it's harder, because --

Kuo:           I know, I know.

FONDREN:       Because when you work in it, when you, now that you work in
               government, you have, you, people say, "Why do you want to
               know this?"

Kuo:           Yeah, yeah.  I know it's hard.

FONDREN:       Very [expletive] hard.

                              *   *   *

FONDREN:       It's all on the Internet and under the, uh, it's protected!  You know
               I went to one site and I was trying to find, uh, I didn't know -- It
               was an acronym, it said JSAMS.  I had no idea what that is.  Well,
               I wonder if that has manuals.  M could be for manuals.  So I tried
               to go into this thing, and it says, you know, "identify yourself, put
               in your password," and it says, "your activities will be monitored
               the whole time you're in here."  You know.

Kuo:           Oh, no.

51.     On or about March 4, 2007, FONDREN and Kuo returned to the topic of how

difficult it was to gather items while working at the Pentagon.  FONDREN said:

               When you see your friend in Taiwan, the General, . . . Let him
               know, this is hard to explain, but for me to be able to get some of
               the information means I have to ask questions and people start
               asking why I want to know that, you know.  If I needed to know
               that, I would already know that.  So it is very, very difficult.

52.     In the same conversation, Kuo and FONDREN discussed going to Taiwan to meet

the General:

                              18

Kuo:            One day, we are going to go to Taiwan to meet this guy.

FONDREN:    Yeah, well, it may have to wait until I leave this job.

Kuo:            You can't go to Taiwan?

FONDREN:    No, I can go. I can go anywhere I want, but you can't officially.
                But you know what? Once my security clearance is done, it is
                good for five years.

Kuo:            Then you can go.

FONDREN:    Then I can go.

53.     In August 2007, FBI agents conducted a pretext interview of FONDREN in an

effort to evaluate the nature of FONDREN's relationship with Kuo. The FBI agents told

FONDREN they were seeking the assistance of government personnel familiar with Asia. At the

outset of the interview, the FBI advised FONDREN that the nature of the interview was sensitive

and confidential, and FONDREN was specifically asked not to discuss the interview openly.

Two days after the FBI interview, FONDREN sent Kuo an email which included the following:

I had a strange visit this week by two FBI guys who said that they were from
Counter Intelligence. They said that I was recommended to them as a person who
knows a lot about Asia and could help them understand Asian customs, etc.

I met with them and they were more interested in the names of people that I know
or talk to. I told them the truth, that you are a wealthy Asian business man from
my home town who has done very well in the import-export business and
furniture manufacturing, and that you tell me stories about China and Taiwan. I
told them the history of working with you and SAIC [Science Applications
International Corp.] and our travel to China and Taiwan a long time ago.

The agents only wrote down only [sic] that information and didn't take notes
when I talked about Vietnam and other Southeast Asia countries. To be honest, I
couldn't determine what they wanted but I doubt that they are really interested in
the political, economic, and security issues affecting Asian countries.

The discussion seemed to be in a bizarre direction, so I wanted you to be aware of
my surprise visit in case you get a surprise also!

19

54.     On or about September 22, 2007, Kuo telephoned FONDREN and requested that he write three papers, including one on the topic of bilateral meetings between PACOM and China.

55.     On or about October 29, 2007, FONDREN sent a CONFIDENTIAL email to himself on his work email account, with the subject, "China – Planning for U.S. SECDEF Visit." The email contained a bullet and sub-bullets derived from a classified PACOM End of Day Update, dated October 19, 2007.

56.     On or about November 3, 2007, FONDREN sent an email to Kuo attaching two documents, one of which was an opinion paper entitled, "DoD-PLA Bilateral Military Meetings," that contained information classified CONFIDENTIAL.

57.     On or about December 9, 2007, FONDREN sent Kuo an email message attaching an opinion paper the defendant had written about future U.S.-PRC bilateral military exchanges in which he had used as a source for his paper "For Official Use Only" bullet points derived from a PACOM End of Day Update, dated December 5, 2007.

58.     On or about February 11, 2008, at his Annandale, Virginia residence, FONDREN possessed a draft document he had created which contained information classified SECRET. FONDREN had earlier created this document by accessing his classified DoD computer in the Pentagon and copying information from a DOS cable classified SECRET. He then incorporated numerous classified passages from this document into an opinion paper entitled, "DoD-PLA Defense Consultative Talks," which he emailed from his residence to Kuo on or about June 5, 2005.

59.     On or about February 11, 2008, at FONDREN's residence in Annandale, Virginia, Kuo had in his possession a draft copy of a DoD document entitled "The National Military Strategy of the United States of America 2008, Version 5," which had been provided to him by FONDREN.  The document was marked "Pre-Decisional Working Document – DDS&P Close Hold."  DDS&P is an acronym for the Deputy Directorate of Strategy and Policy within the Joint Chiefs of Staff.

60.     On or about February 11, 2008, during an interview FBI agents were conducting with FONDREN in connection with an investigation of FONDREN's association with Kuo and others, FONDREN falsely represented to the agents that everything he wrote for Kuo in his opinion papers was based on information from press and media reports and from his experience, and he was sure that he never included any classified information in any of the papers he wrote for Kuo.  In that same interview, FONDREN falsely represented that he had never taken any classified information home, and that he had not given Kuo a draft copy of a DoD document entitled "The National Military Strategy of the United States of America 2008, Version 5."

(In violation of Title 18, United States Code, Section 371.)

COUNT TWO

18 U.S.C. §§ 2 and 951

*Aiding and Abetting an Agent of a Foreign Government*

THE GRAND JURY FURTHER CHARGES THAT:

A.      The Grand Jury realleges and incorporates by reference the General Allegations and the Manner and Means and Overt Acts of Count One of this Indictment.

B.      From in or about 1997 to in or about February 2008, in the Eastern District of Virginia and elsewhere, defendant JAMES WILBUR FONDREN, JR. did unlawfully and knowingly aid and abet Tai Shen Kuo in acting in the United States as an agent of a foreign government (that is, an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official) without prior notification to the Attorney General as required by rules and regulations promulgated by the Attorney General establishing requirements for notification, that is, Title 28, Code of Federal Regulations, Part 73.

(In violation of Title 18, United States Code, Sections 2 and 951.)

22

COUNT THREE

50 U.S.C. § 783(a)

*Unlawful Communication of Classified Information by a Government Employee*

THE GRAND JURY FURTHER CHARGES THAT:

A.     The Grand Jury realleges and incorporates by reference the General Allegations of this Indictment.

B.     On or about November 24, 2004, in the Eastern District of Virginia and elsewhere, defendant JAMES WILBUR FONDREN, JR., while serving as an officer or employee of the United States or of any department or agency thereof, that is, Deputy Director of the United States Pacific Command, Washington Liaison Office, in the Department of Defense, did unlawfully and knowingly communicate in some manner and by some means, to a person whom defendant FONDREN knew or had reason to believe was an agent or representative of a foreign government, information of a kind which had been classified by the President (or by the head of any such department or agency with the approval of the President) as affecting the security of the United States, that is, an opinion paper the defendant had written, entitled "Visit of [senior PRC military official]," which contained information classified CONFIDENTIAL, said defendant knowing or having had reason to know that such information had been so classified, without having been specifically authorized by the President, or by the head of the department or agency by which the defendant was employed, to make such disclosure of such information.

(In violation of Title 50, United States Code, Section 783(a).)

23

COUNT FOUR

50 U.S.C. § 783(a)

*Unlawful Communication of Classified Information by a Government Employee*

THE GRAND JURY FURTHER CHARGES THAT:

A.       The Grand Jury realleges and incorporates by reference the General Allegations of this Indictment.

B.       On or about June 5, 2005, in the Eastern District of Virginia and elsewhere, defendant JAMES WILBUR FONDREN, JR., while serving as an officer or employee of the United States or of any department or agency thereof, that is, Deputy Director of the United States Pacific Command, Washington Liaison Office, in the Department of Defense, did unlawfully and knowingly communicate in some manner and by some means, to a person whom defendant FONDREN knew or had reason to believe was an agent or representative of a foreign government, information of a kind which had been classified by the President (or by the head of any such department or agency with the approval of the President) as affecting the security of the United States, that is, an opinion paper the defendant had written, entitled "DoD-PLA Defense Consultative Talks," which contained information classified SECRET, said defendant knowing or having had reason to know that such information had been so classified, without having been specifically authorized by the President, or by the head of the department or agency by which the defendant was employed, to make such disclosure of such information.

(In violation of Title 50, United States Code, Section 783(a).)

24

COUNT FIVE

50 U.S.C. § 783(a)

*Unlawful Communication of Classified Information by a Government Employee*

THE GRAND JURY FURTHER CHARGES THAT:

A.      The Grand Jury realleges and incorporates by reference the General Allegations of this Indictment.

B.      On or about November 3, 2007, in the Eastern District of Virginia and elsewhere, defendant JAMES WILBUR FONDREN, JR., while serving as an officer or employee of the United States or of any department or agency thereof, that is, Deputy Director of the United States Pacific Command, Washington Liaison Office, in the Department of Defense, did unlawfully and knowingly communicate in some manner and by some means, to a person whom defendant FONDREN knew or had reason to believe was an agent or representative of a foreign government, information of a kind which had been classified by the President (or by the head of any such department or agency with the approval of the President) as affecting the security of the United States, that is, an opinion paper the defendant had written on "DoD-PLA Bilateral Military Meetings," which contained information classified CONFIDENTIAL, said defendant knowing or having had reason to know that such information had been so classified, without having been specifically authorized by the President, or by the head of the department or agency by which the defendant was employed, to make such disclosure of such information.

(In violation of Title 50, United States Code, Section 783(a).)

25

COUNT SIX

<u>18 U.S.C. § 1001</u>

*False Statements*

THE GRAND JURY FURTHER CHARGES THAT:

On or about February 11, 2008, in Arlington County, Virginia, in the Eastern District of Virginia, defendant JAMES WILBUR FONDREN, JR., in a matter within the jurisdiction of the executive branch of the Government of the United States, did unlawfully, knowingly and willfully make a materially false statement and representation, in that, the defendant falsely represented to a law enforcement agent of the Federal Bureau of Investigation that everything he wrote for Kuo in his opinion papers was based on information from press and media reports and from his experience, and he was sure that he never included any classified information in any of the papers he wrote for Kuo, when, as the defendant well knew, he had previously incorporated classified information in opinion papers he had written for, and given to, Kuo.

(In violation of Title 18, United States Code, Section 1001)

COUNT SEVEN

18 U.S.C. § 1001

*False Statements*

THE GRAND JURY FURTHER CHARGES THAT:

On or about February 11, 2008, in Arlington County, Virginia, in the Eastern District of Virginia, defendant JAMES WILBUR FONDREN, JR., in a matter within the jurisdiction of the executive branch of the Government of the United States, did unlawfully, knowingly and willfully make a materially false statement and representation, in that, the defendant falsely represented to a law enforcement agent of the Federal Bureau of Investigation that he had never taken any classified information home, when, as the defendant well knew, he had previously taken home classified information, some of which he had incorporated into opinion papers he had written for, and given to, Kuo.

(In violation of Title 18, United States Code, Section 1001)

27

COUNT EIGHT

18 U.S.C. § 1001

*False Statements*

THE GRAND JURY FURTHER CHARGES THAT:

On or about February 11, 2008, in Arlington County, Virginia, in the Eastern District of Virginia, defendant JAMES WILBUR FONDREN, JR., in a matter within the jurisdiction of the executive branch of the Government of the United States, did unlawfully, knowingly and willfully make a materially false statement and representation, in that, the defendant falsely represented to a law enforcement agent of the Federal Bureau of Investigation that he had not given to Tai Shen Kuo a draft copy of a DoD document entitled "The National Military Strategy of the United States of America 2008, Version 5," when, as the defendant well knew, he had previously given a copy of this document to Kuo.

(In violation of Title 18, United States Code, Section 1001)

A TRUE BILL:

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

_____
F O R E P E R S O N

Dana J. Boente
United States Attorney

By: _____
W. Neil Hammerstrom, Jr.
Assistant United States Attorney

_____
James P. Gillis
Assistant United States Attorney

_____
Ryan Fayhee
Trial Attorney
U.S. Department of Justice

29